## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

|  |  |
|---|---|
| THE EMPLOYEES' RETIREMENT SYSTEM OF THE CITY OF MONTGOMERY, on behalf of itself and all others similarly situated,<br><br>    Plaintiff,<br><br>        v.<br><br>MAYER BROWN LLP,<br><br>    Defendant. | Case No.<br><br>**JURY TRIAL DEMANDED** |

## <u>CLASS ACTION COMPLAINT</u>

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................3

PARTIES ....................................................................................................................3

JURISDICTION AND VENUE ..................................................................................3

STATEMENT OF FACTS ..........................................................................................4

      A.    The Negligence and Gross Negligence of the Defendant Which Resulted in the Loss of the Security Interest of the Term Loan in General Motors' Property ..................................................................................................4

      B.    The Discovery of the Filing of the Main Term Loan UCC-3, and JPMorgan's Concealment Thereof From the Plaintiff and the Other Term Loan Participants ..........................................................................10

CLASS ALLEGATIONS...........................................................................................18

CLAIMS FOR RELIEF

COUNT I - NEGLIGENT MISREPRESENTATION AGAINST MAYER BROWN .........20

COUNT II – PROFESSIONAL MALPRACTICE AND NEGLIGENCE AGAINST MAYER BROWN...................................................................................................23

PRAYERS FOR RELIEF ........................................................................................25

2

## INTRODUCTION

1.     This is an action brought by the Employees' Retirement System of the City of Montgomery ("Plaintiff" or "Montgomery") on behalf of a class of entities that were participants in a General Motors Term Loan, which is defined herein.  Plaintiff brings this action against Defendant Mayer Brown to recover damages caused to Plaintiff and the members of the Class resulting from the loss of the security interest on the collateral that General Motors had provided for the Term Loan.  That security interest was lost due to the negligence, gross negligence and negligent misrepresentations of Mayer Brown, as explained in detail herein.

## PARTIES

2.     Plaintiff is an unincorporated association established under the laws of the State of Alabama.  It is located in Montgomery, Alabama.  Montgomery administers retirement benefits for city and airport authority employees of the City of Montgomery, Alabama. Montgomery was a participant in the General Motors Term Loan, as defined herein, and received a May, 2015 interest payment, and a July, 2015, principal payment, which are both subject to a claw-back action discussed more fully below.

3.     Defendant Mayer Brown LLP ("Mayer Brown" or "Defendant") is a limited liability partnership and law firm established under the laws of Illinois.  Mayer Brown has its headquarters and principal place of business at 71 S. Wacker Drive, Chicago, Illinois 60606. All of Mayer Brown's actions which give rise to the claims asserted in this action took place in Illinois.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1332(d) because (1) this action is a "class action," which contains class allegations and expressly seeks certification of a proposed class; (2) the putative Class consists of hundreds of proposed class

members; (3) the citizenship of at least one Class member is different from the Defendant's citizenship; and (4) the aggregate amount in controversy by the claims of Plaintiff and the putative Class exceeds $5,000,000, exclusive of interest and costs.

5.     This Court has personal jurisdiction over Defendant because Defendant regularly does business in Illinois, is headquartered and has a principal place of business in Illinois, and has been established under the laws of the State of Illinois.

6.     Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391 because Defendant is subject to personal jurisdiction in this District, and Defendant is headquartered and has a principal place of business in this District.  Defendant also regularly does business in this District.  All of the actions taken by the Defendant which gave rise to the claims asserted herein took place in this District.

## STATEMENT OF FACTS

**C.     The Negligence and Gross Negligence of the Defendant Which Resulted in the Loss of the Security Interest of the Term Loan in General Motors' Property.**

7.     In 2008, prior to its 2009 bankruptcy filing, General Motors Corporation ("General Motors") had two unrelated outstanding borrowings.  One was a 2001 secured borrowing structured as a synthetic lease (the "Synthetic Lease") and the other was an unrelated 2006 secured term loan (the "Term Loan"). The two borrowings were syndicated with different syndicates of lenders. The Plaintiff and all members of the putative Class were participants in the Term Loan syndication.

8.     The Synthetic Lease and the Term Loan were each secured by different, unrelated assets of General Motors.

9.     JPMorgan Chase Bank, N.A. ("JPMorgan") was the Administrative Agent and secured party of record for the lenders for both the Synthetic Lease and the Term Loan.

4

10.     The terms of Term Loan were set forth in a Term Loan Agreement, dated as of November 29, 2006, among, *inter alia*, General Motors, as Borrower, Saturn Corporation ("Saturn"), as Guarantor, JPMorgan, as Administrative Agent, and various lenders (the "Term Loan Agreement").

11.     The security interest in substantially all of the collateral for the Term Loan was recorded in a UCC-1 financing statement filed in 2006 with the Delaware Department of State, bearing the number 6416808 4 (the "2006 Main Term Loan UCC-1"). The 2006 Main Term Loan UCC-1 provided that the security interest for the Term Loan was held by JPMorgan, as Administrative Agent for the lenders on the Term Loan.

12.     The Term Loan was syndicated to over 400 lenders. At relevant times, the Plaintiff and the members of the Class held an interest in the Term Loan syndication.

13.     The terms of the Synthetic Lease were set forth in a Participation Agreement ("Participation Agreement"), dated as of October 31, 2001, among, *inter alia*, General Motors, JPMorgan, as Administrative Agent, and various lenders. General Motors' obligation to repay the Synthetic Lease was secured by liens on certain real property identified in the Participation Agreement and related Synthetic Lease documents.

14.     In order to perfect security interests in the collateral securing the Synthetic Lease, UCC-1 financing statements were filed in various counties in which the assets were located. The security interest for the Synthetic Lease was recorded in UCC-1 statements filed in 2001 with the Delaware Department of State, which bore numbers 2092532 5 and 2092526 7.

15.     Those UCC-1 statements provided that the security interest for the Synthetic Lease was held by JPMorgan, as Administrative Agent for the lenders on the Synthetic Lease.

16.    In September 2008, General Motors began the process to pay off the Synthetic Lease, which was nearing maturity.  General Motors had no intention at that time to take any action with respect to the Term Loan.  General Motors instructed its counsel, Mayer Brown, to prepare the necessary documents to effect its payoff of the Synthetic Lease and the corresponding release of the security interests on General Motors property held by JPMorgan, as agent for the Synthetic Lease lenders.  The payoff documentation would include UCC-3 termination statements to be filed with the Delaware Department of State that would terminate the security interest in the General Motors property that secured the Synthetic Lease as recorded in the UCC-1 statements filed in 2001.

17.    Mayer Brown, acting at all times through its authorized partners, associate attorneys and employees located in Chicago, Illinois, prepared those closing documents in a negligent and grossly negligent manner.

18.    Specifically,

The Mayer Brown associate prepared a closing checklist that included several dozen actions and documents required to unwind the Synthetic Lease. Among the items on the Closing Checklist was a list of security interests held by General Motors' lenders that would need to be terminated. To prepare the list of security interests, the associate asked a paralegal, unfamiliar with the transaction or the purpose of the request, to perform a search for UCC-1 financing statements that had been recorded against General Motors in Delaware. The paralegal's search identified three UCC-1s, numbered 2092532 5, 2092526 7, and 6416808 4. Neither the paralegal nor the associate realized that only two of the UCC-1s were related to the Synthetic Lease transaction. The third UCC-1, number 6416808 4, related to the 2006 Main Term Loan UCC-1. Not noticing that one of the UCC-1s was unrelated to the Synthetic Lease, the associate placed all three for termination in the Closing Checklist:

Termination of UCCs (central, DE filings) Blanket-type financing statements as to real property and related collateral located in Marion County, Indiana (file number 2092532 5, file date 4/12/02 and file number 2092526 7, file date 4/12/02)) financing statement as to equipment,

6

fixtures and related collateral located at certain U.S. manufacturing facilities (file number 6416808 4, file date 11/30/06)

*Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.),* 755 F.3d 78, 80 (2d Cir. 2014).

19. The Mayer Brown paralegal was Stewart Gonshorek. The Mayer Brown associate was Ryan Green. Before Mayer Brown provided the Synthetic Lease closing documents to JPMorgan and its counsel with respect to the Synthetic Lease, Simpson Thacher and Bartlett LLP ("Simpson Thacher"), Gonshorek approached Green and inquired why the properties identified in the Term Loan financing statement were broader than the properties covered by the Synthetic Lease. Specifically, Gonshorek raised the issue that a UCC-3 termination statement that bore the number of the 2006 Main Term Loan UCC-1 – 641808 4 covered cities and states that were not included in the Synthetic Lease closing checklist. Green dismissed the issue and decided that the UCC-3 termination statement that bore the number of the 2006 Main Term Loan UCC-1 – 641808 4 should nonetheless be filed.

20. Mayer Brown created, and included within the closing documents for the Synthetic Lease, a UCC-3 termination statement that bore the number of the 2006 Main Term Loan UCC-1 - 6416808 4. Accordingly, on its face, that UCC-3, if filed with the Delaware Department of State, would release the security interest held by JPMorgan as secured party of record for the lenders on the Term Loan, which security interest was recorded with the Delaware Department of State by the 2006 Main Term Loan UCC-1 numbered 6416808 4. The Term Loan, however, was still outstanding; it was not being repaid by General Motors; and there was no basis or reason to release the security interest on the collateral for the Term Loan.

21. Mayer Brown sent the closing documents it had prepared for the Synthetic Lease to Simpson Thacher with the knowledge, intent and express expectation, that Simpson Tacher

would provide the closing documents to JPMorgan, and specifically to Richard W. Duker ("Duker") who was, at all times relevant hereto, a Managing Director of JPMorgan.

22.    Mayer Brown knew from the UCC-3 statement that bore the number 6416808 4, which it drafted, that JPMorgan, as secured party, was acting as Administrative Agent, for a syndicate of lenders.

23.    Among the closing documents that Mayer Brown sent to Simpson Thacher, and which Simpson Thacher sent to JPMorgan and Duker, were:

   a.  the closing checklist which negligently misrepresented that the UCC-1 which bore file number 6416808 4 (file date 11/30/06), was one of the liens that was associated with and needed to be terminated in connection with the repayment of the Synthetic Lease, and

   b.  the UCC-3 statement that bore the number 6416808 4, which, if filed, would release the security interest held by JPMorgan as secured party of record for the lenders on the Term Loan, pursuant to the 2006 Main Term Loan UCC-1.

24.    Specifically,

On October 15, 2008, the Mayer Brown associate e-mailed all three draft UCC-3s to Simpson Thacher, along with the Termination Agreement and a copy of the Closing Checklist. Simpson Thacher attorney Mardi Merjian responded two days later as follows: "Nice job on the documents. My only comment, unless I am missing something, is that all references to JPMorgan Chase Bank, as Administrative Agent for the Investors should not include the reference 'for the Investors.'"

*Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.)*, 755 F.3d 78, 81 (2d Cir. 2014).

25.    Mayer Brown also negligently and grossly negligently prepared an Escrow Agreement:

8

... that instructed the parties' escrow agent how to proceed with the closing. Among other things, the Escrow Agreement specified that the parties would deliver to the escrow agent the set of three UCC-3 termination statements (individually identified by UCC-1 financing statement filing number) that would be filed to terminate the security interests that General Motors' Synthetic Lease lenders held in its properties. The Escrow Agreement provided that once General Motors repaid the amount due on the Synthetic Lease, the escrow agent would forward copies of the UCC-3 termination statements to General Motors' counsel for filing. When Mayer Brown e-mailed a draft of the Escrow Agreement to JPMorgan's counsel for review, the same Simpson Thacher attorney responded that "it was fine" and signed the agreement.

*Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.)*, 777 F.3d 100, 105 (2d Cir. 2015).

26.     JPMorgan, at all times acting through its authorized officers, directors, and employees, including Duker, approved the closing documents and Escrow Agreement prepared by and submitted to it by Mayer Brown, including the UCC-3 statement that bore the number 6416808 4, which, if filed, would release the security interest held by JPMorgan as secured party of record for the lenders on the Term Loan, pursuant to the 2006 Main Term Loan UCC-1.

27.     On or about October 30, 2008, Mayer Brown caused the UCC-3 statement that bore the number 6416808 4 to be filed with the Delaware Department of State. (That UCC-3 statement is hereafter sometimes referred to as the "Main Term Loan UCC-3".)

28.     As a direct and proximate result of the negligence, gross negligence and negligent misrepresentations of Mayer Brown, the Main Term Loan UCC-3 was filed with the Delaware Department of State on October 30, 2008.

29.     As described below, on January 21, 2015, the United States Court of Appeals for the Second Circuit held that the filing of the Main Term Loan UCC-3 terminated the Term Loan security interest in General Motors' property that had been previously recorded by the 2006

Main Term Loan UCC-1. *Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.)*, 777 F.3d 100 (2d Cir. 2015).

**D.      The Discovery of the Filing of the Main Term Loan UCC-3, and JPMorgan's Concealment Thereof From the Plaintiff and the Other Term Loan Participants**

30.      Between October 30, 2008 and June 1, 2009, General Motors continued to treat JPMorgan and the Term Loan participants, in all respects, as fully perfected secured parties under the Term Loan Agreement, which included the issuance of collateral value certificates on December 2, 2008, March 23, 2009 and on the eve of General Motors' bankruptcy, on May 28, 2009.

31.      On June 1, 2009, General Motors filed for protection under Ch. 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

32.      Sometime in the middle of June 2009, attorneys at Morgan Lewis, counsel for JPMorgan in connection with the General Motors bankruptcy and in connection with the Term Loan, discovered that the Main Term Loan UCC-3 had been filed with the Delaware Department of State in October 2008.

33.      Shortly thereafter JPMorgan and/or Morgan Lewis informed the Official Committee of Unsecured Creditors of Motors Liquidation Company f/k/a General Motors Corporation (the "Creditors Committee") of the filing of the Main Term Loan UCC-3.

34.      However, JPMorgan did not inform the Plaintiff or, on information and belief, the other Term Loan participants that the Main Term Loan UCC-3 had been filed, either in June 2009 or at any other time thereafter.

35.      On June 25, 2009, the Bankruptcy Court entered a Debtor-In-Possession order ("DIP Order"), which authorized and instructed the debtor, General Motors, to pay JPMorgan, on

10

behalf of all of the Term Loan participants, 100% of the principal and interest due on the Term Loan, within three days of the DIP Order. General Motors made that payment to JPMorgan, and in early July, 2009, JPMorgan paid the Plaintiff and all the other Term Loan participants, the principal amount and interest due on the Term Loan.

36. When JPMorgan distributed 100% of the principal and interest due on the Term Loan to the Plaintiff and the other Term Loan participants in early July, 2009, JPMorgan did not inform the Plaintiff or the other Term Loan participants:

    a. that the Main Term Loan UCC-3 had been filed with the Delaware Department of State;

    b. that the security interest in the collateral could be, and in all likelihood would be, challenged by the Creditors Committee;

    c. that as a result of the challenge it may be determined that the security interest had been terminated; and

    d. that the Plaintiff and the other Term Loan participants might be required to pay back the funds being distributed to them.

37. The DIP Order authorized the Creditor's Committee to bring any claim with respect to or challenge to the perfection of first priority liens of any of the Prepetition Senior Facilities Secured Parties, as defined in the DIP order, by filing adversary proceedings in the Bankruptcy Court on or before July 31, 2009.

38. The Term Loan was a Prepetition Senior Facility and JPMorgan (as Administrative Agent for the Term Loan and as the secured entity of interest for the Term Loan collateral), the Plaintiff and the other Term Loan participants, were Prepetition Senior Facilities Secured Parties as defined in the DIP Order.

11

39. On July 31, 2009, the Creditors Committee initiated an Adversary Proceeding (No. 09-00504 (REG)) in the General Motors bankruptcy (the "Adversary Proceeding"). The defendants in the Adversary Proceeding were JPMorgan, the Plaintiff, and all of the other Term Loan participants that had received interest payments on the Term Loan from General Motors in May 2009 and/or had received the above-described principal and interest payments in July 2009, pursuant to the DIP Order.

40. In its Adversary Complaint, the Creditors Committee asserted that the security interest in the debtor's property that had been recorded by the 2006 Main Term Loan UCC-1, had been terminated by the October 2008 filing of the Main Term Loan UCC-3.

41. Neither the Plaintiff nor any of the other Term Loan participants were served with process in the Adversary Proceeding until May 2015, as described below. Only JPMorgan was served with such process in 2009.

42. After the Adversary Proceeding had been initiated by the Creditors Committee, on July 31, 2009, JPMorgan took affirmative steps to prevent the Plaintiff and the other Term Loan participants from learning that the Adversary Proceeding had been filed. This also had the intent and effect of preventing the Plaintiff and the other participants in the Term Loan from learning that the Main Term Loan UCC-3 had been filed due to the misconduct of Mayer Brown, as alleged herein.

43. JPMorgan entered into stipulations with the Creditors Committee in the Adversary Proceeding which provided that service of process upon the Plaintiff and the other Term Loan participants would be deferred until a final determination in the Adversary Proceeding whether the filing of the Main Term Loan UCC-3 with the Delaware Department of State had terminated the security interest of the Term Loan. Specifically,

12

a. By Stipulation dated October 6, 2009 between JPMorgan and the Creditors Committee, JPMorgan accepted service of the Adversary Proceeding Complaint. The Stipulation recognized that the other defendants had not been served and further provided: "The Committee shall have 240 days to complete service on the other defendants, without prejudice to seek an additional extension of time to serve the summons and Complaint upon other defendants, if necessary."

b. By Stipulation dated January 20, 2010, JPMorgan and the Creditors Committee agreed to modify the October 6, 2009 stipulation to provide that: "The Committee shall have until thirty (30) days after the date of entry of the Court's decision on any dispositive motion made under this modified Stipulated Scheduling Order to serve the summons and complaint upon other defendants."

c. On March 25, 2013, JPMorgan and the Creditors Committee filed a Proposed Order in the Adversary Proceeding "that the time by which Plaintiff shall serve the Summons and Complaint upon the Other Defendants is extended to thirty (30) days after the date of entry of a Final Order [by the Bankruptcy Court, after appeals thereof], without prejudice to the right of Plaintiff to seek additional extensions thereof."  The Proposed Order was entered by the Bankruptcy Court on April 10, 2013.

44.    By entering into the aforesaid agreements and stipulations, JPMorgan intentionally concealed from the Plaintiff and the other Term Loan participants that it had authorized the filing of the Main Term Loan UCC-3 with the Delaware Department of State, which on its face released the security interest in the collateral securing the Term Loan which had been effected by the 2006 Main Term Loan UCC-1.

13

45.    By entering into the stipulations to defer service of the Summons and Complaint on the Term Loan participants, JPMorgan intentionally concealed from the Plaintiff and the other Term Loan participants that the Creditors Committee was asserting in the Adversary Proceeding that the filing of the Main Term Loan UCC-3 had terminated the security interest on most of the collateral for the Term Loan.

46.    Neither the Plaintiff nor, on information and belief, any of the other Term Loan participants were informed by JPMorgan, or anyone else, of the filing of or the pendency of the Adversary Proceeding at any time from its filing on July 31, 2009 through May, 2015.

47.    The Plaintiff had no knowledge that the Adversary Proceeding had been filed and was pending against it until May 2015, when it was served with an Amended Complaint that had been filed in the Adversary Proceeding, as described below.

48.    On information and belief, none of the other Term Loan participants knew that the Adversary Proceeding had been filed and was pending against them until May 2015, when they were served with an Amended Complaint that had been filed in the Adversary Proceeding, as described below.

49.    On March 1, 2013, the Bankruptcy Court issued a decision in the Adversary Proceeding, in which it held that the filing of the Main Term Loan UCC-3 had not terminated the Term Loan security interest created by the 2006 Main Term Loan UCC-1.  *See Official Comm. v. JPMorgan Chase Bank, NA (In re Motors Liquidation Co.)*, 486 B.R. 596, 602 (Bankr. S.D.N.Y. 2013). However, the Creditors Committee appealed that decision to the Second Circuit.

50.    Neither JPMorgan, nor anyone else, informed the Plaintiff or, on information and belief, the other Term Loan participants of the Bankruptcy Court's decision or the Creditors Committee's appeal of that decision.

51.    On June 7, 2014, the Second Circuit certified a question of law to the Delaware

Supreme Court in connection with the Creditors Committee's appeal.  Specifically, the Second

Circuit asked the Delaware Supreme Court to decide whether,

> Under UCC Article 9, as adopted into Delaware law by Del. Code Ann. tit. 6, art.
> 9, for a UCC-3 termination statement to effectively extinguish the perfected
> nature of a UCC-1 financing statement, is it enough that the secured lender review
> and knowingly approve for filing a UCC-3 purporting to extinguish the perfected
> security interest, or must the secured lender intend to terminate the particular
> security interest that is listed on the UCC-3?

*Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank,*

*N.A. (In re Motors Liquidation Co.)*, 755 F.3d 78, 86 (2d Cir. 2014).

52.    Neither JPMorgan, nor anyone else, informed the Plaintiff or, on information and

belief, the other Term Loan participants of the Second Circuit's certification of that legal

question to the Delaware Supreme Court.

53.    On October 17, 2014, the Delaware Supreme Court held that

> [F]or a termination statement to become effective under § 9-509 and thus to have
> the effect specified in § 9-513 of the Delaware UCC, it is enough that the secured
> party authorizes the filing to be made, which is all that § 9-510 requires. The
> Delaware UCC contains no requirement that a secured party that authorizes a
> filing subjectively intends or otherwise understands the effect of the plain terms of
> its own filing.

*Official Comm. of Unsecured Creditors of Motors Liquidation Co.*, 103 A.2d 1010, 1017-18

(Del. 2014)

54.    In explaining it decision, the Delaware Supreme Court observed, most aptly in

light of the Defendant's grossly negligent conduct in this case:

> Before a secured party authorizes the filing of a termination statement, it ought to
> review the statement carefully and understand which security interests it is
> releasing and why. A secured party is master of its own termination statement; it
> works no unfairness to expect the secured party to review a termination statement
> carefully and only file the statement once it is sure that the statement is correct. If
> parties could be relieved from the legal consequences of their mistaken filings,
> they would have little incentive to ensure the accuracy of the information

contained in their UCC filings.

*Id.* at 1016.

55.     Neither JPMorgan, nor anyone else, informed the Plaintiff or, on information and belief, the other Term Loan participants of that decision of the Delaware Supreme Court.

56.     On January 21, 2015, the Second Circuit issued its decision, reversing the Bankruptcy Court's March 1, 2013 decision, and holding that the Term Loan security interest had been terminated by the filing of the Main Term Loan UCC-3, pursuant to JPMorgan's authorization. In so holding the Second Circuit said:

> JPMorgan and Simpson Thacher's repeated manifestations to Mayer Brown show that JPMorgan and its counsel knew that, upon the closing of the Synthetic Lease transaction, Mayer Brown was going to file the termination statement that identified the Main Term Loan UCC-1 for termination and that JPMorgan reviewed and assented to the filing of that statement. Nothing more is needed.

*Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.)*, 777 F.3d 100, 105 (2d Cir. 2015).

57.     Neither JPMorgan, nor anyone else, informed the Plaintiff or, on information and belief, the other Term Loan participants of that decision of the Second Circuit.

58.     On May 20, 2015, the Creditors Committee (now known as the Motors Liquidation Company Avoidance Trust) (the "Avoidance Trust") filed a First Amended Adversary Complaint in the Adversary Proceeding (the "Amended Complaint"). JPMorgan, the Plaintiff, and all of the other Term Loan participants that received interest payments for the Term Loan from General Motors in May 2009 and/or received principal and interest payments for the Term Loan in or about July 2009 were named as defendants.

59.     In its Amended Complaint, the Avoidance Trust seeks to claw back from the Plaintiff the July 2009 principal and interest payment and the May 2009 interest payment that it received.  The Avoidance Trust likewise seeks to claw back the July 2009 principal and interest

payments and the May 2009 interest payments received by each of the other Term Loan participants.

60.     The Plaintiff was served with the Amended Complaint and Summons by counsel for the Avoidance Trust in late May or June 2015.  On information and belief, most of the other Term Loan participants were also served around that time. This was the first notice that the Plaintiff, and on information and belief, the other Term Loan participants had received that the security interest of the Term Loan established by the 2006 Main Term Loan UCC-1 had been challenged or had been lost.

61.     All of the claims asserted herein have been timely filed.  Plaintiff and, on information and belief, the other Term Loan participants did not discover and could not with reasonable diligence have discovered the facts underlying the claims until late May or early June 2015, when it was served with the Amended Complaint in the Adversary Proceeding.

62.     As detailed herein, JPMorgan intentionally failed to, and did not, disclose to the Plaintiff and the other Term Loan participants that the Main Term Loan UCC-3 had been filed and that the Creditors Committee was challenging the continued viability of the 2006 Main Term Loan UCC-1 throughout the period from mid-June 2009 through May 2015.

63.     The Plaintiff and the other Term Loan participants were entitled to rely on their appointed agent for the Term Loan, JPMorgan, to preserve their security interests in the Team Loan and had no obligation to seek to discover what JPMorgan knew and was intentionally hiding from them.

64.     Having appointed JPMorgan as their agent to represent their interests on the Term Loan, for which JPMorgan was paid a fee as the Administrative Agent, the Plaintiff and other Term Loan participants had no separate duty to monitor the status of the security interests. To

17

require them to monitor the security interests in the Term Loan, a task that they had already appointed JPMorgan to perform, would undermine the entire intent and purpose of the appointment of JPMorgan as Administrative Agent.

65.     Neither Plaintiff, nor, on information and belief, the other Term Loan Participants, knew or reasonably should have known that they had been injured by Mayer Brown's malpractice, and negligent misrepresentation, until May or June, 2015, when they were served with the Amended Complaint in the Adversary Proceeding.

## CLASS ALLEGATIONS

66.     Pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this complaint on behalf of itself and all other Term Loan participants that received interest payments for the Term Loan from General Motors in May 2009 and/or received principal and interest payments for the Term Loan on or about July 2009 (the "Class"). Excluded from the Class are JPMorgan and any of its affiliates.

67.     Upon completion of discovery with respect to the scope of the Class, Plaintiff reserves the right to amend the definition of the Class.

68.     There are several hundred members of the Class.

69.     Plaintiff's claims raise questions of law and fact that are common to each member of the Class that predominate over any questions affecting any individual members including, inter alia, the following:

> a. Whether Mayer Brown acted negligently and was grossly negligent in its preparation of the Synthetic Lease closing documents by preparing and including within those closing documents the Main Term Loan UCC-3;

b. Whether Mayer Brown owed a duty to Plaintiff and the Class, independently and/or as a result of its duties to JPMorgan, in connection with its review and approval of the closing documents for the Synthetic Lease including the Main Term Loan UCC-3;

c. Whether Mayer Brown acted negligently and was grossly negligent in its review and approval of the closing documents for the Synthetic Lease, and in particular its review and approval of the Main Term Loan UCC-3; and

d. Whether Mayer Brown made negligent misrepresentations with respect to the Synthetic Lease closing documents and, in particular, with respect to the inclusion therein of the Main Term Loan UCC-3.

70. The claims of Plaintiff are typical of the claims of each member of the Class. Plaintiff alleges a common set of facts and theories of recovery against Defendant relating to the Term Loan and the course of conduct that lead to the release of the Class members' security interest in the Term Loan through the filing of the Main Term Loan UCC-3 with the Delaware Department of State. Plaintiff and the Class seek identical remedies under identical legal theories based on identical factual occurrences. There is no antagonism or factual variation between Plaintiff's claims and those of the Class.

71. Plaintiff will fairly and adequately protect and represent the interest of each member of the Class. Plaintiff is fully cognizant of its responsibilities as class representative and has retained experienced counsel fully capable of, and intent upon, vigorously prosecuting this action on behalf of the Class.

72. A class action is superior to other available methods for the fair and efficient adjudication of the controversy within the meaning of Rule 23(b) and in consideration of the

matters set forth in Rule 23(b)(3)(A)-(D). The maintenance of separate actions would place a substantial and unnecessary burden on the courts and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of all members of the Class.

## CLAIMS FOR RELIEF
## COUNT I
## NEGLIGENT MISREPRESENTATION AGAINST MAYER BROWN

73.     The Plaintiff realleges and incorporates each of the preceding paragraphs as if fully set forth herein.

74.     Mayer Brown is a law firm and is in the business of supplying information for the guidance of others in their business transactions.

75.     Mayer Brown was retained by General Motors to, *inter alia*, conduct a UCC search and compile all necessary documents and signatures for the release of the lien securing the Synthetic Lease.

76.     As part of its engagement, Mayer Brown compiled and transmitted an erroneous closing list of lien documents to be released. The closing list prepared by Mayer Brown was erroneous because it included a lien document that bore the number of the 2006 Main Term Loan UCC-1 filing for the wholly separate and unrelated Term Loan that actually secured the Term Loan and had no relationship to the Synthetic Lease. That lien, which Mayer Brown wrongfully included in its list of liens to be released as part of the Synthetic Lease payoff should not have been released as it secured the interests of the Plaintiff and the Class members on the wholly separate Term Loan.

77.    After compiling the erroneous closing list, Mayer Brown transmitted that list to Simpson Tacher with the knowledge, expectation and intent that it would be transmitted to JPMorgan and to Duker.

78.    When preparing the closing documents, and transmitting them to JPMorgan's counsel, Mayer Brown knew that JP Morgan, as secured party, was acting as Administrative Agent for a syndicate of lenders.

79.    The entire purpose of Mayer Brown's compilation and communication of the closing list was to influence the actions of JPMorgan and specifically to obtain its assent to the release of the liens contained in the closing list.  Mayer Brown intended, knew or reasonably should have known that JPMorgan would rely on the closing lien document list that Mayer Brown had communicated to JPMorgan, through its counsel at Simpson Thacher.   Indeed, that was the reason why Mayer Brown transmitted that closing checklist to JPMorgan's counsel for the Synthetic Lease.

80.    Because the purpose of Mayer Brown's preparation and transmittal of the closing list to JPMorgan was to influence JPMorgan to grant its consent to the release of the liens attendant to the Synthetic Lease payoff transaction, Mayer Brown owed a duty of reasonable care to JPMorgan, Plaintiff and the Class for which JPMorgan was acting as Administrative Agent, to, *inter alia*, ensure that the representations it was making to JPMorgan with respect to what liens were to be released were accurate and correct.

81.    Mayer Brown knew, or but for its negligent and grossly negligent legal work, should have known, that the 2006 Main Term Loan UCC-1 and Main Term Loan UCC-3, bore no relationship to the Synthetic Lease, and that it was inappropriate to release the 2006 Main Term Loan UCC-1 in connection with the pay-off of the Synthetic Lease.

82. Mayer Brown breached its duty of care owed to JPMorgan, Plaintiff, and the members of the Class by negligently misrepresenting to JPMorgan that the 2006 Main Term Loan UCC-1 was related to the Synthetic Lease, and due to be terminated, in connection with the pay-off of the Synthetic Lease, when that was not the case. Instead, as Mayer Brown knew or, but for its negligence and gross negligence, should have known, the 2006 Main Term Loan UCC-1 secured the collateral for the wholly separate and unrelated Term Loan on which JPMorgan was also the agent, but for a different group of lenders; namely, the Plaintiff and the Class members.

83. As a direct, foreseeable, and proximate cause of Mayer Brown's negligent misrepresentation and breach of its duty of care owed to JPMorgan, the Plaintiff and the Class members were injured because JPMorgan, based on its reliance of Mayer Brown's misrepresentations, approved the release of liens listed by Mayer Brown in its communication to JPMorgan. This caused immediate, direct, and foreseeable injury to Plaintiff and the Class members because their security under the Term Loan was immediately released, transforming Plaintiff and the Class members into unsecured creditors, and thereby devaluing the value of their interest in the Term Loan.

84. Plaintiff and the Class members, who reasonably relied upon Mayer Brown's negligent misrepresentations, are entitled to and do hereby seek all available damages, including but not limited to consequential, expectation, benefit-of-the bargain, incidental, statutory, and/or special or punitive damages to the fullest extent permitted by any and all applicable laws as redress for Mayer Brown's negligent misrepresentation.

## COUNT II

## PROFESSIONAL MALPRACTICE AND NEGLIGENCE AGAINST MAYER BROWN

85.     The Plaintiff realleges and incorporates each of the preceding paragraphs as if fully set forth herein.

86.     Defendant Mayer Brown was retained by General Motors to, *inter alia*, conduct a UCC search and compile all necessary documents and signatures for the release of the lien securing the Synthetic Lease.

87.     As part of its engagement, Mayer Brown compiled and transmitted an erroneous closing list of lien documents to be released.  The list of lien closing documents prepared by Mayer Brown was erroneous because it included a lien document that bore the number of the 2006 Main Term Loan UCC-1 filing for the wholly separate and unrelated Term Loan that actually secured the Term Loan and had no relationship whatsoever to the Synthetic Lease.  That lien, which Mayer Brown wrongfully included in its list of liens to be released as part of the Synthetic Lease payoff should not have been released as it secured the interests of Plaintiff and the Class members on the wholly separate Term Loan.

88.      After compiling the erroneous closing list, Mayer Brown transmitted that list to Simpson Tacher with the knowledge, expectation and intent that it would be transmitted to JPMorgan and to Duker.

89.     When preparing the closing documents, and transmitting them to JP Morgan's counsel, Mayer Brown knew that JP Morgan, as secured party, was acting as Administrative Agent for a syndicate of lenders.

90.     The entire purpose of Mayer Brown's compilation and communication of the closing list was to influence the actions of JPMorgan and, specifically to obtain its assent to have

the liens contained in the closing list prepared by Mayer Brown released as part of the Synthetic Lease payoff transaction. Mayer Brown knew or reasonably should have known that JPMorgan would rely on the closing lien document list.

91.     Because the purpose of Mayer Brown's preparation and transmittal of the closing list to JPMorgan was to influence JPMorgan to grant its consent to the release of liens attendant to the Synthetic Lease payoff transaction, Mayer Brown owed a duty of reasonable care to JPMorgan, Plaintiff, and the members of the Class, for which JPMorgan was acting as Administrative Agent, that required Mayer Brown and its attorneys and employees to exercise reasonable care and the care that would be exercised by a reasonably skilled attorney and law firm under the circumstances in, *inter alia*, conducting the lien search, compiling the closing list, and communicating the closing list document to the counter-party to the transaction, JPMorgan.

92.     Mayer Brown breached its duty of care owed to JPMorgan, Plaintiff and the members of the Class because it negligently conducted its lien search so as to wrongfully include within its list of liens to be released the 2006 Main Term Loan UCC-1 for the wholly separate and unrelated Term Loan on which JPMorgan was also the agent; negligently compiled a closing list document that purported to itemize the liens to be released as part of the Synthetic Lease payoff transaction; and negligently represented to JPMorgan that the documents on the closing list that Mayer Brown had prepared were the liens to be released by JPMorgan as part of the Synthetic Lease payoff.

93.     As a direct, foreseeable, and proximate cause of Mayer Brown's negligence, malpractice, and breach of its duty of care owed to JPMorgan, the Plaintiff and the Class members were injured because JPMorgan, based on its reliance on Mayer Brown's misrepresentations, approved the release of liens listed by Mayer Brown in its communication to

24

JPMorgan. This caused immediate, direct, and foreseeable injury to Plaintiff and the Class members because a large portion of the collateral securing their loan made as part of the wholly separate Term Loan was immediately released, transforming Plaintiff and the Class members into unsecured creditors, and thereby devaluing their interest in the Term Loan.

94.     The Plaintiff and the Class members are therefore entitled to and do hereby seek all available damages, including but not limited to consequential, expectation, benefit-of-the-bargain, incidental, statutory, and/or special or punitive damages to the fullest extent permitted by any and all applicable laws as redress for Mayer Brown's negligence, professional malpractice, and breach of its duties of care.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiff, on its own behalf and on behalf of the members of the Class, respectfully requests:

A.     That that the Court certify this action as a class action pursuant to Federal Rule of Civil Procedure 23 (a) and (b) (3) and appoint Plaintiff as the representative of the Class, and its counsel as counsel for the Class;

B.     that the Court enter judgment awarding actual damages to Plaintiff and the Class against Defendant in an amount to be determined at trial together with prejudgment and post-judgment interest at the maximum rate allowed by law;

C.     that the Court award appropriate and reasonable attorneys' fees and expenses and the costs of this suit;

D.     that the Court enter the appropriate declaratory relief to which Plaintiff and the Class are entitled; and

E.     that the Court award such other and further relief as it may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff, individually and on behalf of the Class, demands a trial by jury on all claims and issues so triable.

Dated: July 31, 2015

By its attorneys,

/s/ Michael J. Freed
Michael J. Freed
Heather Bessinger
Freed Kanner London & Millen LLC
2201 Waukegan Road, Suite 130
Bannockburn, Illinois 60015
Tel: (224) 632-4500
mfreed@fklmlaw.com
hbessinger@fklmlaw.com

Edward F. Haber
Michelle H. Blauner
SHAPIRO HABER & URMY LLP
Seaport East
Two Seaport Lane
Boston, Massachusetts 02210
Tel: (617) 439-3939
ehaber@shulaw.com
mblauner@shulaw.com
imcloughlin@shulaw.com
astewart@shulaw.com
pvallely@shulaw.com

Bobby Segall
COPELAND FRANCO PA
444 South Perry Street
Montgomery, Alabama 36101
Tel: (334) 834-1180
segall@copelandfranco.com

26

Roy Katriel
THE KATRIEL LAW FIRM PC
4224 Executive Square, Suite 600
La Jolla, California 92037
Tel: (858) 242-5642
rak@katriellaw.com

***Counsel for Plaintiff and the Class***